J-S90026-16

2017 PA Super 69

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| HUGO M. SELENSKI | |
| Appellant | No. 1068 EDA 2016 |

Appeal from the Judgment of Sentence September 21, 2009
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0001225-2006

BEFORE:  OTT, J., SOLANO, J., and JENKINS, J.

OPINION BY SOLANO, J.:                        **FILED MARCH 16, 2017**

Appellant Hugo M. Selenski appeals from his judgment of sentence following this Court's remand for an evidentiary hearing pursuant to ***Commonwealth v. Walker***, 92 A.3d 766 (Pa. 2014), which abolished Pennsylvania's *per se* ban of the admission of expert testimony regarding eyewitness identifications in criminal cases.  The question presented is whether, under ***Walker***, the trial court properly declined to admit such expert evidence in a case in which it found that an eyewitness identification was not the sole or primary evidence of the defendant's guilt.  After careful consideration, we affirm.

On July 10, 2009, a jury convicted Appellant of multiple offenses, including kidnapping, robbery, attempted burglary, criminal conspiracy, theft by unlawful taking, simple assault, false imprisonment, and terroristic

threats[1] — all with respect to a home invasion and attack on a jeweler named Samuel Goosay. The trial court recounted the facts adduced at trial as follows:

> On January 27, 2003, two men broke into Mr. Goosay's residence just after dinner wearing ski masks and brandishing a gun. The men handcuffed Mr. Goosay and placed duct tape over his eyes while threatening him and questioning him about the alarm code to his jewelry store and $20,000 in cash. Mr. Goosay gave the men a partial code and one of them went, in Mr. Goosay's car, to the jewelry store where he attempted and failed to break in and disarm the alarm. During this time, the other man stayed with Mr. Goosay. At some point during the altercation, the metal handcuffs initially used to bind Mr. Goosay's hands were switched to plastic flex cuffs.
>
> Mr. Goosay was seated on the bed while the man who had stayed behind ransacked the master bedroom. At this time, Mr. Goosay was able to push the duct tape over one eye and see that his assailant had left the gun on top of a nearby dresser. Mr. Goosay grabbed the gun and a fight ensued where the assailant overtook Mr. Goosay, obtained the gun, and sat Mr. Goosay back on the bed to put a flex cuff around his ankles. While the assailant was putting the flex cuff on his ankles, Mr. Goosay saw the assailant's face without the ski mask. The assailant commented that it did not matter that Mr. Goosay saw his face because the assailant was not "from around here" and that Mr. Goosay would "never recognize [him]" and will "never know who [he] is."
>
> Shortly thereafter, the alarm company at Mr. Goosay's jewelry store called his home phone and indicated that police were being dispatched to the store because the alarm had been triggered. Upon receiving this information, the assailant hit Mr. Goosay in the head and quickly left. Mr. Goosay removed some of his restraints and telephoned the police. The police collected the flex cuffs and duct tape from inside Mr. Goosay's house as well as pictures of footprints in the snow outside Mr. Goosay's

---

[1] 18 Pa.C.S. §§ 2901, 3701, 901, 3502, 903, 3921, 2701, 2903 and 2706.

home. Among the footprints was one from a New Balance sneaker.

During the time this case was being investigated, police located human remains on [Appellant's] property in Luzerne County. Two bodies, those of Michael Kerkowski, Jr. and Tammy Fasset, were found buried behind [Appellant's] residence. Police determined that Kerkowski was a small business owner and Fasset was his girlfriend. Both victims were bound with flex cuffs: Fasset was bound around her hands, ankles, and neck and Kerkowski was bound around his hands. Additionally, Kerkowski had duct tape over his eyes. Upon searching [Appellant's] garage, home, and the vehicle he used, police located flex cuffs, duct tape, ski masks, metal handcuffs, a black BB pistol, and New Balance sneakers.

The flex cuffs on [Appellant's] property and those used to bind Mr. Goosay were found to be from a common source. The New Balance sneakers that were found in [Appellant's] garage were identified by [Appellant's] ex-girlfriend, Tina Strom, as belonging to [Appellant]. Moreover, an expert in the field of footwear impressions concluded that the prints left outside Mr. Goosay's home could have been left by [Appellant's] sneakers because "the physical size, the general state of wear, and the lack of accidental characteristics" on [Appellant's] sneakers matched the same on the impression in the snow.

During the trial, both the Commonwealth and [Appellant] presented evidence regarding Mr. Goosay's pretrial identifications of [Appellant]. Six months after the incident, Corporal Shawn Noonan showed Mr. Goosay a photo array that contained a picture of [Appellant] from 2001. Mr. Goosay failed to identify [Appellant] in this first array. Approximately two years later, Agent Scott Endy showed Mr. Goosay another photo array containing a picture of [Appellant] from May of 2003. Mr. Goosay was able to identify [Appellant]. Mr. Goosay was also able to identify [Appellant] at trial.

Trial Court Opinion, 3/4/16, at 2-4 (citations to notes of testimony and footnotes omitted).

Prior to trial, Appellant sought to contest Mr. Goosay's identification of him as the perpetrator by presenting an expert witness on eyewitness

identification and on factors that can lead to inaccurate identification. Because Pennsylvania law at that time precluded such testimony, the trial court declined to permit this evidence. After three days of trial, a jury convicted Appellant of the aforestated charges, and on September 21, 2009, the trial court sentenced Appellant to an aggregate 32½ to 65 years' incarceration.

Appellant filed a direct appeal in which he challenged the trial court's exclusion of the expert testimony on eyewitness identification, and this Court affirmed his judgment of sentence. *Commonwealth v. Selenski*, 18 A.3d 1229 (Pa. Super. 2011). Appellant then petitioned for allowance of an appeal to the Supreme Court. During the pendency of his petition, on May 28, 2014, the Supreme Court rendered its decision in *Walker,* which reversed the longstanding ban on expert eyewitness identification testimony. The Supreme Court subsequently granted Appellant's petition and remanded his case to this Court. *Commonwealth v. Selenski*, 100 A.3d 206 (Pa. 2014). The Supreme Court's *per curiam* order stated:

> **AND NOW,** this 29th day of August, 2014, the Petition for Allowance of Appeal is **GRANTED, LIMITED TO** Petitioner's first issue, as stated by Petitioner:
>
> Does the constitutional right to present a defense include the right to offer proven science bearing on the understanding of human memory and perception, and police practices in the identification process, where those advances are unknown to laypersons?
>
> Further, the Superior Court's order affirming the judgment of sentence is **VACATED,** and the matter is **REMANDED** to the Superior Court for further consideration in light of

- 4 -

*Commonwealth v. Walker,* ––– Pa. ––––, 92 A.3d 766 (2014). In all other respects, the Petition for Allowance of Appeal is **DENIED.**

*Selenski*, 100 A.3d at 206.

Upon receipt of the Supreme Court's order, this Court received new briefs and heard argument and then remanded the case to the trial court "so that it may perform its traditional gatekeeper function with regard to the proposed expert testimony." **Commonwealth v. Selenski**, 117 A.3d 1283, 1285 (Pa. Super. 2015). Notably, the Commonwealth's brief emphasized that "the [Supreme] Court maintained that such testimony generally would only be permitted 'where the Commonwealth's case is solely or primarily dependent upon eyewitness testimony.'" Commonwealth's Br. in **Commonwealth v. Selenski**, No. 352 EDA 2010, at 9 (Pa. Super. Jan. 26, 2015) (quoting **Walker**, 92 A.3d at 787). The Commonwealth argued that this is not a case in which expert testimony would be allowed under **Walker** because "Selenski was convicted following the jury's careful consideration of the Commonwealth's entire case, which included testimony from law enforcement officers, who participated in the investigation of this crime, testimony from Selenski's former girlfriend, physical evidence, scientific analysis of the physical evidence, crime scene photographs, as well as photographs taken during the execution of the search warrant on Selenski's home, in addition to the eyewitness identification by the victim, Mr. Goosay." *Id.* at 6. In our opinion, however, we summarized the evidence relating to Mr. Goosay's identification of Appellant, **see Selenski**, 117 A.3d at 1283,

and then said we would "decline the invitation of the parties to bypass the trial court" and would not determine ***Walker***'s applicability ourselves in the first instance. ***Id.*** at 1285-86.

In the trial court on remand, Appellant moved to present expert testimony by Dr. Jennifer Dysart, who proposed to detail "13 factors that can be relevant to eyewitness identifications" and to opine, "after reviewing partial records from this case and [Appellant's] case in Luz[e]rne County, [that] 9 of these 13 factors apply in [Appellant's] case." Trial Ct. Op. at 6.[2] The trial court concluded that Appellant's motion "logically necessitates a decision regarding whether a defendant is entitled to a new trial based on the admission of expert testimony not allowed at his first trial." ***Id.***

---

[2] In his brief, Appellant explains:

> At the hearing, Dr. Dysart testified to two categories of factors that can affect eye witness identification accuracy: estimator variables, the factors that happen during the event and at the crime scene, and system variables, which are factors that are related to police procedure. Dr. Dysart testified to four estimator variables that are present in Mr. Selenski's case: effects of brief exposure on memory, post-event memory contamination, effects of delay on memory, and effects of stress on memory. Dr. Dysart also testified to six system variables that are present in this case: the use of a simultaneous rather than a sequential lineup, the use of a non-blind lineup procedure, pre-identification instruction bias, witness confidence and accuracy, post-identification feedback, and unconscious transference.

Appellant's Brief at 10.

In considering this issue, the trial court held an evidentiary hearing. At the beginning of the hearing, the court said it would "conduct first what under the new law we'll say will be a *Fry*[*e*[3]] hearing and then further analysis under *Walker*." N.T., 10/20/15, at 6. After hearing testimony by Dr. Dysart, the court concluded that Dr. Dysart's testimony was inadmissible. In making that determination, the trial court made no ruling regarding the admissibility of the testimony under *Frye*.[4] Instead, the court held that, under *Walker*, the testimony was inadmissible because Mr. Goosay's eyewitness identification "was not the sole or primary evidence against [Appellant] at trial" and there was sufficient non-identification evidence to convict Appellant beyond a reasonable doubt. Trial Ct. Op. at 6, 8, 10. The court stated:

> As with all evidence, expert testimony must first be relevant to the case in order to be admissible. *See* Pa.R.E. 402 ("All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is inadmissible."); *see also Commonwealth v. Cook*, 952 A.2d 594, 602 (Pa. 2008). Indeed, the Supreme Court addressed this very issue in *Walker*, finding that "the use of expert testimony regarding eyewitness testimony *when relevant* does not improperly intrude upon the jury's credibility determinations." *Walker*, 92 A.3d at 788 (emphasis added). The Supreme Court specifically stated

---

[3] Under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), the proponent of expert testimony must show that the expert's methodologies are generally accepted in the relevant scientific community. *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1043-44 (Pa. 2003).

[4] The Commonwealth did not challenge the evidence's admissibility under *Frye.* Commonwealth Brief at 11 n.2.

that cases in which this type of expert testimony would be relevant are "where the Commonwealth's case is *solely or primarily dependent* upon eyewitness testimony." **Id.** at 787 (emphasis added). After careful review of the record, the testimony from the hearing, and the parties' briefs, we find [Appellant's] proffered expert testimony on eyewitness identification does not meet the relevancy standard expressed in **Walker** and thus renders the testimony of Dr. Dysart inadmissible at trial.

In **Walker**, the only evidence presented by the Commonwealth was the eyewitness identifications of Walker from alleged victims. **Id.** at 791. The Supreme Court noted that these identifications could have been tainted by some of the factors that Dr. Dysart discussed in relation to [Appellant's] case. **Id.** (for example, stress, instruction bias, and post-identification confidence). Unlike **Walker**, however, the Commonwealth's case against [Appellant] consisted of an abundance of circumstantial evidence which placed [Appellant] in Mr. Goosay's home on January 27, 2003. Thus, we need not reach the relevance of each factor discussed by Dr. Dysart because the Commonwealth presented sufficient evidence at trial to convict Defendant of the crimes charged.

In its brief, the Commonwealth argues that this case does not fit into the **Walker** framework because the Commonwealth did not rely on Mr. Goosay's eyewitness identification since there was other, corroborating evidence. [Appellant] argues primarily for the relevance of each factor discussed by Dr. Dysart. However, in his reply brief, [Appellant] addresses the overall relevance of Dr. Dysart's testimony and disagrees with the Commonwealth because he claims no "direct evidence" other than Mr. Goosay's eyewitness identification was presented against him. In essence, the issue is whether the evidence presented against [Appellant] at trial, absent Mr. Goosay's eyewitness identification, was sufficient to convict Defendant. **See Walker**, 92 A.3d at 787.

In determining whether sufficient evidence was presented at trial to warrant a conviction, the appellate courts apply the following standard: "whether viewing all evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." [Citation omitted.] "This standard is equally applicable to cases where the

- 8 -

evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." [Citation omitted.] Moreover, Pennsylvania has long recognized that convictions can be based entirely on circumstantial evidence. . . .

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, testimony on eyewitness identification would be irrelevant to this case. The Commonwealth's case against [Appellant] did not solely or primarily depend on Mr. Goosay's identification. . . . Even without Mr. Goosay's eyewitness identification, we find the combination of evidence links [Appellant] to the crimes against Mr. Goosay beyond a reasonable doubt, thus placing this case outside the category of cases contemplated by the Supreme Court in **Walker**.

*Id.* at 6-7, 10 (footnotes and citations to briefs omitted). The court therefore denied Appellant's request for a new trial at which he could introduce the expert evidence.

Appellant then filed this timely appeal in which he presents a single issue for our review:

DID THE TRIAL COURT ABUSE ITS DISCRETION IN DENYING [APPELLANT'S] REQUEST FOR AN EYEWITNESS IDENTIFICATION EXPERT AND A NEW TRIAL WHEN THE EXPERT TESTIMONY REGARDING EYEWITNESS IDENTIFICATION MEETS THE TWO-PRONGED TEST ISSUED BY THE COURT IN **COMMONWEALTH V. WALKER**?

Appellant's Brief at 5.

Appellant asserts that the trial court abused its discretion in denying his request for a new trial at which he could present Dr. Dysart's testimony. In this regard, we observe that an abuse of discretion "is not merely an error of judgment"; rather, discretion is abused "if in reaching a conclusion[,] the

law is over ridden or misapplied, or the judgment exercised is manifestly unreasonable," or it is "the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record." **Walker**, 92 A.3d at 772-73.

**Relevance and Discretion under *Walker***

Because the trial court based its decision to exclude Dr. Dysart's expert testimony on language in the Supreme Court's opinion in **Walker**, we first consider whether the trial court correctly interpreted and applied the **Walker** decision. To our knowledge, no reported Pennsylvania appellate decisions have construed **Walker** since that case was decided.

**Walker** was a watershed decision that abandoned Pennsylvania's prior rule that expert testimony regarding eyewitness identifications in criminal trials is *per se* impermissible. The case turned primarily on two assault victims' identifications of the defendant from photo arrays. The defendant sought to present expert testimony that would cast doubt on the reliability of the victims' identifications, but the trial court disallowed the testimony under Pennsylvania's *per se* rule, and the defendant ultimately was convicted. In a lengthy opinion, the Supreme Court reversed.

The Supreme Court noted that "[e]yewitness evidence may be extremely probative of guilt and is often times crucial to the Commonwealth's case against a defendant," but that "there is no doubt that wrongful conviction due to erroneous eyewitness identification continues to be a pressing concern for the legal system and society." **Walker**, 92 A.3d at

779-80. After surveying empirical research and recent non-Pennsylvania court decisions that counseled in favor of abandoning Pennsylvania's *per se* rule, the Court turned to "practical concerns" raised by the Commonwealth in opposition to permitting expert testimony, including "the possibility of the use of such expert testimony in numerous cases." ***Id.*** at 787. In response, the Court stated:

> Initially, we envision that allowing such expert testimony would be limited to certain cases. As discussed below, such testimony would only be permitted where relevant. Pa.R.E. 401. ***While we need not precisely define such situations, generally speaking, it would be where the Commonwealth's case is solely or primarily dependent upon eyewitness testimony.*** Thus, contrary to the Commonwealth's suggestion that permitting expert testimony would impact thousands of cases, we believe the scope of removing the *per se* ban on such testimony would be limited, and, again, at the discretion of the trial judge.

***Id.*** at 787-88 (emphasis added). The trial court focused heavily on the emphasized sentence in this paragraph when it declined to admit the expert evidence in Appellant's case.

The Supreme Court described its holding in ***Walker*** as follows:

> [W]e believe an absolute ban on expert testimony in this area is no longer the best approach in determining how to assist the finder of fact where mistaken identification is at issue. Importantly, our decision today is limited to this unique area of the law, where, as noted above, the case law from other jurisdictions and the research is compelling. Thus, we believe that it is time to take the step of joining those jurisdictions which allow the admission of expert testimony on relevant factors concerning eyewitness identification, at the discretion of the trial court, subject to an abuse of discretion appellate standard of review.

92 A.3d at 788. The Court then delineated some "further aspects of our limited decision." *Id.* The Court explained that the evidence must: involve explanations and inferences not within the range of ordinary knowledge; help the trier of fact understand the evidence or determine an issue; under *Frye*, be based on a scientific methodology that is generally accepted in the relevant scientific community; under Rule 401 of the Rules of Evidence, be relevant; and under Rule 403, have a probative value that is not outweighed by the danger of such adverse consequences as undue prejudice or delay.

*Id.* at 788-92. With respect to relevance, the Court stated:

> Relevance is defined as evidence having "any tendency to make a fact more or less probable tha[n] it would be without the evidence; and the fact is of consequence in determining the action." Pa.R.E. 401(a), (b). Here, there was no direct evidence against Walker other than eyewitness identifications. Thus, the eyewitness identifications were central to Walker's conviction. Moreover, Appellant was the subject of cross-racial identification, made by witnesses that were under stress, and who were robbed at gunpoint. The police in this appeal did not instruct the witnesses when viewing the array that their assailant may or may not have been included in the array, and finally, while one witness equivocated during her identification of Appellant during the array and lineup, she declared with confidence her identification at trial. . . . Thus, we believe at least in these limited circumstances, expert testimony on these aspects of eyewitness identification could be highly relevant.

*Id.* at 791.

Finally, at the end of its opinion, the Court summarized:

> We now allow for the possibility that such expert testimony on the limited issue of eyewitness identification as raised in this appeal may be admissible, at the discretion of the trial court, and assuming the expert is qualified, the proffered testimony relevant, and will assist the trier of fact. Of course, the question

of the admission of expert testimony turns not only on the state of the science proffered and its relevance in a particular case, but on whether the testimony will assist the jury. Trial courts will exercise their traditional role in using their discretion to weigh the admissibility of such expert testimony on a case-by-case basis. It will be up to the trial court to determine when such expert testimony is appropriate. If the trial court finds that the testimony satisfies *Frye*, the inquiry does not end. The admission must be properly tailored to whether the testimony will focus on particular characteristics of the identification at issue and explain how those characteristics call into question the reliability of the identification. We find the defendant must make an on-the-record detailed proffer to the court, including an explanation of precisely how the expert's testimony is relevant to the eyewitness identifications under consideration and how it will assist the jury in its evaluation. The proof should establish the presence of factors (e.g., stress or differences in race, as between the eyewitness and the defendant) which may be shown to impair the accuracy of eyewitness identification in aspects which are (or to a degree which is) beyond the common understanding of laypersons.

. . . What we do is remand for the possibility of a *Frye* hearing in this matter, leaving open admissibility questions such as relevance and probative value. . . .

Thus, we hold that the admission of expert testimony regarding eyewitness identification is no longer *per se* impermissible in our Commonwealth, and join the majority of jurisdictions which leave the admissibility of such expert testimony to the discretion of the trial court. We reverse the order of the Superior Court which, based upon our prior case law, banned this type of testimony. As the trial court determined that a *Frye* hearing was not permissible, relying upon our prior case law, we remand to the trial court for full consideration of such expert testimony, including the possibility of a *Frye* hearing, consistent with our decision today.

*Walker*, 92 A.3d at 792–93.

In excluding the testimony of Dr. Dysart, the trial court stated that the

testimony would not be relevant under *Walker* because "[t]he Supreme

Court specifically stated that cases in which this type of expert testimony

would be relevant are 'where the Commonwealth's case is *solely or primarily dependent* upon eyewitness testimony.'" Trial Ct. Op. at 6 (quoting **Walker**, 92 A.3d at 797 (emphasis added by trial court)). The court held that this test was not met because there was "an abundance of [non-identification] circumstantial evidence which placed [Appellant] in Mr. Goosay's home" on the day of the crime. *Id.* at 7.

In reaching this conclusion, however, the court conflated its analysis of relevance under **Walker** with the question whether there was sufficient non-identification evidence to support Appellant's conviction, making exclusion of the proffered expert evidence harmless. *See* Trial Ct. Op. at 8 ("In essence, the issue is whether the evidence presented against [Appellant] at trial, absent Mr. Goosay's eyewitness identification, was sufficient to convict [Appellant]"). In doing so, the court explained that although the evidentiary issue under **Walker** normally would be considered as "a pretrial matter," it now was before the court in connection with a request for a new trial after Appellant's conviction, and that this post-trial posture called for **Walker** to be applied with a retrospective look at the sufficiency of the evidence that supported the conviction. *See id.* at 6.

In the end, the trial court held that this case is "outside the category of cases contemplated by the Supreme Court in **Walker**," and the expert evidence therefore was inadmissible. Trial Ct. Op. at 10. The court did not explicitly state whether it interpreted **Walker** to foreclose admission of

- 14 -

expert identification evidence in cases failing to meet the "solely or primarily dependent" test of relevance that it derived from the Supreme Court's opinion, and it did not discuss whether it had authority to admit the evidence if that test was not met. However, the court clearly interpreted the passage it quoted from *Walker*, 92 A.3d at 797, as authority for declining to admit expert identification evidence where the "solely or primarily dependent" test is not met, and it therefore declined to admit the evidence, which would have required the grant of a new trial.

In his brief to this Court, Appellant does not directly address the trial court's interpretation of *Walker*.[5] Rather, the bulk of Appellant's brief presents a lengthy argument about why the proffered testimony by Dr. Dysart would meet the two requirements for admissibility that were identified at the end of the *Walker* opinion: satisfaction of the *Frye* standard, and demonstration of how the proffered evidence relates to the eyewitness identification by Mr. Goosay and would assist the jury. *See* Appellant's Br. at 12-40. Then, in a short section at the end of his brief, Appellant argues that the trial court abused its discretion in holding the expert evidence irrelevant "because the remaining circumstantial evidence presented by the Commonwealth, without the eyewitness identification, was

_____

[5] Appellant does not interpret the trial court's decision differently than we do or contend that the trial court made an error of law in the way that it interpreted *Walker*. Indeed, Appellant does not identify the trial court's interpretation of *Walker* as an issue in this appeal.

not sufficient to prove Mr. Selenski's guilt beyond a reasonable doubt." *Id.*

at 40 (underlining in heading omitted); *see id.* at 40-43. Appellant states:

> In its opinion, the trial court erroneously denies Mr. Selenski's request for eyewitness identification expert and new trial, finding that Dr. Dysart's testimony is inadmissible as irrelevant because Mr. Goosay's eyewitness identification was not the sole or primary evidence presented against Mr. Selenski at trial. (Trial Court Opinion at 6). While it is well established that a criminal conviction may be based entirely on circumstantial evidence, the circumstantial evidence presented must be sufficient to prove that defendant guilty beyond a reasonable doubt. [Citations omitted.] In the instant case, the circumstantial evidence presented against Mr. Selenski does not meet that standard.

Appellant's Brief at 40-41. Like the trial court, Appellant therefore appears to conflate the standard for determining relevance under *Walker* with a test requiring the non-identification evidence to be sufficient to prove guilt.

In response, much of the Commonwealth's brief reprises the argument that the Commonwealth made to this Court at the time of the Supreme Court's remand, asserting that the circumstantial evidence of Appellant's guilt is sufficient to justify exclusion of Dr. Dysart's expert testimony. *See* Commonwealth Brief at 12-13. The Commonwealth insists that expert identification evidence should not be admitted unless it meets the "solely or primarily dependent" test of relevance that it distills from the Supreme Court's language, and the Commonwealth takes specific issue with Appellant's focus on whether the non-identification evidence at Appellant's trial was sufficient to prove his guilt beyond a reasonable doubt, arguing that *Walker* does not permit use of such a standard. *Id.* at 13-14.

We have reviewed the Supreme Court's opinion in *Walker* in light of the parties' competing positions. Having done so, we first reject any suggestion by Appellant that the test of admissibility under *Walker* is whether the non-identification evidence in the case would be sufficient to convict the defendant beyond a reasonable doubt. Nothing in the *Walker* decision suggests such a standard. The trial court's opinion injected confusion on this issue by conflating the test of relevance under *Walker* with the standard of evidentiary sufficiency that is used to decide a request for post-trial relief.[6] Although we agree with the trial court that the post-trial posture of this case requires the assessment of relevance under *Walker* to be done retrospectively, the fact that this issue is before the court following Appellant's conviction does not justify use of a relevancy standard different from that specified by the Supreme Court.

Second, although we agree with the Commonwealth that *Walker* **permits** exclusion of expert testimony about eyewitness identifications on grounds of relevance if the case is not "solely and primarily dependent" on the identifications, *see Walker*, 92 A.3d at 787, we do not read *Walker* to

---

[6] The trial court's opinion is unclear. Because the ultimate question before the court was whether the exclusion of Appellant's expert identification evidence entitled Appellant to a new trial, the court may have engaged in a harmless error inquiry to determine whether exclusion of the expert evidence justified relief. The question on which we remanded, however, was whether the expert evidence was admissible, and the trial court should have analyzed that evidentiary question separately.

**require** such exclusion. The Supreme Court did **not** explicitly say that the expert evidence would be relevant **only** if it met a "solely or primarily dependent" test. Rather, the Court stated that the expert evidence could be permitted only in cases where it was relevant, and added: "we need not precisely define such situations." **See id.** In addition, the Court qualified its statement that the evidence would be relevant in cases "solely or primarily dependent upon eyewitness testimony" by saying that the Court was "generally speaking." **See id.** The Court said that such limited use of the testimony was what "we envision," **id.**, not what it was requiring.

The "solely or primarily dependent" test is notably more stringent than the general test of relevance set forth in Evidence Rule 401, which the Supreme Court quoted with approval later in its **Walker** opinion: "any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." **See** 92 A.3d at 791. The Court's "solely or primarily dependent" language was particularly appropriate to the facts of **Walker**, which turned almost entirely on the victims' eyewitness identification, but the Court nevertheless used the more general test of Rule 401 when discussing those facts. **See id.**

The importance of eyewitness identification evidence in criminal cases varies from case to case. On one end of the spectrum are those cases that turn solely on such evidence. Close to that pole are cases in which there may be some other inculpatory evidence, but the eyewitness evidence is

that on which the case is primarily dependent. At the opposite end are cases where there is no eyewitness identification at all. And in between, of course, is a broad range of cases in which eyewitness evidence is just one element of the prosecution's case, with varying importance depending on the other evidence presented and the perspective of the fact-finder receiving the evidence. *Walker* makes clear that cases at the first pole, where the eyewitness evidence is critical, are appropriate for expert eyewitness testimony. Common sense dictates that cases at the other end, where there is no eyewitness testimony, need no such expert. But *Walker* sets forth no hard and fast rules about the extent to which a trial court may exercise discretion to admit or decline to admit expert evidence in that broad swath of cases that lies between the two poles.

In this respect, we observe that the Supreme Court in *Walker* repeatedly emphasized the broad discretion that is vested in trial courts regarding the admission of such expert testimony. The Court held that eyewitness identification expert evidence would now be allowed "at the discretion of the trial court, subject to abuse of discretion appellate review." 92 A.3d at 788. In the same paragraph in which it "envision[ed]" limited use of the expert testimony in cases "solely or primarily dependent upon eyewitness testimony," the Court predicted that the impact of its decision "would be limited, and, again, at the discretion of the trial judge." *Id.* at 788. Toward the end of its opinion the Court repeated that it was allowing

for the admission of such evidence "at the discretion of the trial court." **Id.** at 792. And the Court then emphasized: "Trial courts will exercise their traditional role in using their discretion to weigh the admissibility of such expert testimony on a case-by-case basis. It will be up to the trial court to determine when such expert testimony is appropriate." **Id.** It was in this context that our remand decision in this case declined the Commonwealth's invitation to hold that the Supreme Court's "solely or primarily dependent" language absolutely foreclosed admissibility of expert eyewitness identification evidence in this matter, and we instead returned this case to the trial court to "perform its traditional gatekeeper function with regard to the proposed expert testimony" in the first instance. **Selenski**, 117 A.3d at 1285.[7]

We understand **Walker** to hold that expert evidence about eyewitness identifications is most clearly relevant where a case is solely or primarily

---

[7] **See also Commonwealth v. Alicia**, 92 A.3d 753, 765 (Pa. 2014) (dissenting opinion), in which then-Justice Saylor, who had joined the majority opinion in **Walker**, observed:

> In **Walker** . . ., "this Court lifted the absolute prohibition against expert testimony concerning eyewitness identifications, investing judgment about the admissibility of such evidence within the sound discretion of trial judges. . . . I believe **Walker** represents an exercise in judicial modesty. After **Walker**, . . . in appropriate cases — where the science is sound and the evidence is deemed probative and necessary — we will not inflexibly block litigants' attempts to educate jurors about matters we are learning may be further from the realm of everyday experience than our predecessors had envisioned.

dependent on the identifications, but that a trial court has discretion to determine that the evidence is relevant in other situations too, weighing its admissibility "on a case-by-case basis." **Walker**, 92 A.3d at 792. The Court's "solely or primarily dependent" language did not establish a special new definition of relevance for this class of cases that forecloses admissibility in all other situations. Rather, the language simply identified cases where, "generally speaking," relevance would be most clear. The trial courts retain power to exercise their discretion to determine that expert evidence also is relevant in other situations, so long as persuasive proof of relevance is presented under Rule 401; by the same token, they retain broad discretion to determine that expert evidence should not be admitted in those other situations if the standards of Rule 401 are not met. As the Supreme Court observed, in most cases that do not turn solely or primarily on eyewitness identifications, trial courts are most likely to conclude that proffered expert identification evidence is not relevant.

In addition, as the Supreme Court in **Walker** emphasized, trial courts retain broad discretion under Evidence Rule 403 to weigh the probative value of the proffered evidence against concerns about such things as unfair prejudice, jury confusion, delay, and the inefficiencies resulting from presentation of cumulative evidence. The scales in that balance necessarily weigh less in favor of admitting the evidence when its relevance to the case — and, thus, its probative value — is weaker. Therefore, in those cases that

- 21 -

are not solely or primarily dependent on eyewitness identifications, a trial court may more readily exclude proffered expert evidence about such identifications upon a showing of countervailing concerns. The expert evidence may not be "*per se* excluded . . . merely because the trial might be simpler without it," ***Walker***, 92 A.3d at 791, but the court may accord greater importance to concerns about delay and "wasting time," Pa. R. Evid. 403, where eyewitness evidence is less critical to the case. Thus, this analysis too is likely to result more often in the exclusion of proffered expert evidence in cases that do not turn solely or primarily on eyewitness identifications.

### Application of *Walker* to This Case

*Whether This Case Was*
*Solely or Primarily Dependent on Identification Evidence*

The trial court concluded that this case was not solely or primarily dependent on Mr. Goosay's identification of Appellant, and that the proffered expert testimony by Dr. Dysart therefore was not clearly relevant under that formulation of the relevance standard that it derived from the ***Walker*** opinion. We have concluded that an assessment of relevance under ***Walker*** is not limited to application of a "solely or primarily dependent" test. However, because we agree that the Appellant's expert identification evidence clearly would be relevant under ***Walker*** if this case were solely or primarily dependent on identification evidence, we begin by considering whether the trial court erred in its examination of that question.

In determining whether this case was solely or primarily dependent on identification evidence, the trial court engaged in a retrospective review of the record to determine the importance of Mr. Goosay's identification when compared with the other evidence in the case. Our review of that record — three days of trial in which several witnesses other than Mr. Goosay testified — causes us to agree with the trial court that this case did not turn solely or primarily on Mr. Goosay's identification of Appellant. We summarize just a portion of the non-identification evidence here.

First, although Mr. Goosay identified Appellant as one of his assailants at trial, his testimony also included other details that linked the crimes to Appellant, including Mr. Goosay's description of the assailant's use of gray duct tape and "flex cuffs,"[8] which, as discussed below, were later found at Appellant's residence. *See* N.T., 7/8/09, at 20-89, 176-78. But much of the case was based on forensic evidence presented by law enforcement witnesses.

For example, Pennsylvania State Trooper Jody Radziewicz testified that he is a trained forensic analyst and was called to Mr. Goosay's home on the night of the home invasion to photograph, collect, and secure evidence. N.T., 7/8/09, at 91-94, 114. Trooper Radziewicz took impressions from two

_____

[8] Trooper Edward Urban explained that, "depending on your profession, you may refer to [a flex cuff] as a cuff, a tie, or a zip tie." N.T., 7/8/09, at 202-03.

sets of footprints, one made by New Balance sneakers, and another by work boots, in the snow around Mr. Goosay's home. *Id.* at 97-98. Christina Strom, Appellant's ex-girlfriend, testified that she had lived with Appellant, and she identified a pair of size 10½ New Balance sneakers recovered from Appellant's home as belonging to Appellant. *Id.* at 131-34, 138. Pennsylvania State Police Sergeant Kevin Deskiewicz, who was qualified as an expert in the field of impression evidence, then testified that he analyzed two pairs of Appellant's size 10½ New Balance sneakers in connection with photographs of two distinct sneaker impressions from the Goosay home. N.T., 7/9/09, at 32. He identified one of the pairs "as a possible source for the crime scene impressions." *Id.* at 35. His analysis included the "tread design, the physical size, the general state of wear, and the lack of accidental characteristics." *Id.* at 40.

Trooper Radziewicz also photographed the "flex cuff or wire tie and a piece of duct tape that was found in the living room of the Goosay residence" and identified as evidence the actual flex cuffs, duct tape, and glove recovered from the Goosay home, all of which were admitted into evidence. N.T., 7/8/09, at 103, 106-07, 111-12. Another State Trooper, Edward Urban, testified to being a trained forensic analyst who was called in June of 2003 to the property where Ms. Strom and Appellant resided. He said he found handcuffs in a desk drawer of that house, along with "a set of white flex cuff or flex tie type material." *Id.* at 195-96. He described the

"flex cuff as kind of a half-moon around a pack of Camel cigarettes." *Id.* at 196. Ms. Strom identified the "handcuffs" or "flex ties" admitted into evidence through Trooper Radziewicz, and said, "we've had them around the house in different areas, and at one time I saw them under the floor mat in my Honda on the passenger side." *Id.* at 142. After she found them under the floor mat, she asked Appellant what they were, but he did not reply. *Id.* at 143. John Evans, a forensic science supervisor at the Harrisburg Regional Crime Laboratory who was qualified as an expert in the field of trace evidence, N.T., 7/9/09, at 4, 15, testified that he "was asked to compare to see whether there was a common source between the [flex ties] in the photographs [from Mr. Goosay's home] and the one in the evidence envelopes [from Appellant's home]." *Id.* at 7-8. His conclusion was that "to a reasonable degree of scientific certainty," the "ties in the photographs could share a common origin with the two ties in the manila envelopes." *Id.* at 16.

Kimberly Smith testified that she worked at the dry cleaners located near Mr. Goosay's jewelry store. On the evening of the home invasion, she was in the parking lot when she noticed Mr. Goosay's car pull up. A man who was not Mr. Goosay exited the vehicle and approached Mr. Goosay's jewelry store, where she saw him "jiggling with the lock on the door." N.T., 7/8/09, at 125-26. She "was calling the security guard over [when she] heard the alarm beep." *Id.* at 126. When the police arrived, Ms. Smith "noticed a

white vehicle that was parked horizontally on the parking spaces. And as I flagged the security guard over, that car had sped away around to the back of the building." *Id.* at 127, 129. Ms. Strom testified that she, Appellant, and Appellant's friend Paul Weakley all drove a white Honda Accord. N.T., 7/8/09, at 143-44. She also testified that in January of 2003 — around or after the time of the invasion of Mr. Goosay's home — she saw that Mr. Weakley was injured, with a "goose egg" and dried blood on his head. *Id.* at 139.

Ms. Strom additionally testified that she saw a "black gun" in the bedroom she shared with Appellant at their house, and saw Mr. Weakley "shooting a pellet gun" there. N.T., 7/8/09, at 140, 147. Pennsylvania State Trooper Joseph Cocco, a trained forensic analyst, testified that he "process[ed] vehicles that were involved in this investigation," searched Ms. Strom's white Honda Accord, and found a roll of duct tape and a black pellet gun. *Id.* at 175-176. He also found a black pistol. *Id.*

Ms. Strom further testified that she began dating Appellant in September of 2001, and moved in with him "as soon as we started dating." N.T., 7/8/09, at 131-132. In May of 2002, Ms. Strom purchased the home she shared with Appellant for $160,000, with a $10,000 down payment Appellant gave her even though he was not working at the time. *Id.* at 136-137. Ms. Strom "did not know" where the $10,000 came from. *Id.* at 136. At the time of trial, Ms. Strom had been charged with money laundering in

connection with past activities with Appellant. *Id.* at 165. She said she would "get money" from Appellant, purchase money orders, and pay her bills. *Id.* at 166. She did not know where any of the money came from. *Id.* Ms. Strom would go to "like five different post offices" and get money orders in "whatever amount the post office would let me take." *Id.*

Trooper Urban testified to an earlier investigation of the Luzerne County property where Appellant resided. In that investigation, Trooper Urban uncovered human remains from two individuals: Tammy Fassett and Michael Kerkowski. *Id.* at 189.[9] Both individuals had been bound with "white plastic flex cuff — flex tie type material." *Id.* at 190. "Mr. Kerkowski also had some duct tape that went around his face." *Id.* In the garage of the property, Trooper Urban discovered and photographed "a plastic bin with sneakers and other material in it from the detached garage." *Id.* at 191-192. There were also sweatshirts and ski masks. *Id.* at 194. Another forensics expert, Pennsylvania State Trooper James Shubzda, testified to recovering the flex ties from the autopsies of Michael Kerkowski and Tammy Fassett and photographing and processing them for analysis. *Id.* at 208-211. In its opinion, the trial court paid particular attention to the significance of the Kerkowski/Fassett evidence:

_____

[9] In Appellant's appeal from his conviction in 2014, we affirmed the trial court's admission of the evidence about this earlier matter over Appellant's objection.

Additionally, the bodies of Michael Kerkowski, Jr. and Tammy Fassett were found buried on Defendant's property. Both bodies were bound with flex ties similar to the way Mr. Goosay had been bound and Kerkowski had duct tape over his eyes. Kerkowski was similarly a small business owner and his father, who knew Defendant, was threatened multiple times by Defendant in an effort to obtain money. Other similarities between this case and Defendant's Luz[e]rne County case include the following: (1) the assailant in the present case and Defendant both used a gun and threats of burning down a home to get what they wanted; (2) the assailant in the present case and Defendant both demanded specific sums of money; (3) the assailant in the present case and Defendant both removed items from the scene that could have potentially left DNA evidence; and (4) Mr. Goosay was attacked in his home and Kerkowski and Fassett appear to have been attacked in Kerkowski's home.

Trial Ct. Op. at 9-10 (citations and footnote omitted).

In view of this "abundance of circumstantial evidence" that was produced at trial, we conclude that the trial court correctly held that "the Commonwealth's case against [Appellant] did not solely or primarily depend on Mr. Goosay's identification." Trial Ct. Op. at 7, 10. Indeed, nowhere in Appellant's brief does he argue otherwise. Clearly, in light of all of the circumstantial evidence, the Commonwealth's case was not "solely" dependent on Mr. Goosay's eyewitness identification. And a review of the record makes clear that it was not "primarily" dependent on the identification either. Rather, the primary evidence in the case was the forensic evidence linking Appellant to the crime scene and demonstrating Appellant's common scheme in Luzerne County. While Mr. Goosay's identification of Appellant certainly was an element of the Commonwealth's case, the bulk of the case was comprised of other evidence. Accordingly,

Appellant's proffered expert testimony was not relevant and admissible under the portion of the **Walker** opinion that set forth the "solely or primarily dependent" test for determining admissibility.

*Whether the Proffered Expert Evidence*
*Was Otherwise Relevant and Admissible*

The remaining question is whether the trial court should have admitted Dr. Dysart's expert testimony even though this case did not turn solely or primarily on Mr. Goosay's identification. As we have observed, the Supreme Court's decision preserves trial courts' discretion to receive expert identification evidence if they elect to do so, consistent with Evidence Rules 401 and 403. But Appellant's brief contains no argument that the trial court abused its discretion in failing to admit the evidence after determining that the "solely or primarily dependent" test applied by the trial court was not met, and, in fact, does not argue that expert identification evidence is admissible in such situations at all. Any argument along those lines therefore is waived.

Appellant does argue that the non-identification evidence in this case was "not enough to prove Mr. Selenski's guilt beyond a reasonable doubt," Appellant's Brief at 43, but, as we have discussed, that is not the appropriate standard for assessing the evidentiary question under **Walker**. In addition, Appellant presents no substantial grounds in support of this argument. Appellant challenges the evidence of similarity between the underlying crimes in this case and the crimes in Luzerne County by

referencing a California study that, he says, shows that the use of duct tape and flex ties has become too ubiquitous to be probative of a common plan or scheme, *see id.* at 41-42; but that California study is not in evidence, and it is far too late to challenge the admissibility of the Luzerne County evidence now. Appellant also argues about the significance of other isolated facts in the case. *See id.* at 42-43. However, the jury, within its province as fact-finder, heard all of the evidence, which consisted mostly of non-identification evidence, and weighed it accordingly in rendering its guilty verdicts. Where, as here, a trial based primarily on non-identification evidence produced a judgment of sentence that was upheld on direct appeal, there was no basis for the trial court to exercise discretion to admit proffered expert testimony on eyewitness identification.

The trial court determined that the expert witness testimony proffered by Appellant was not admissible under *Walker*. The record supports that determination. Based on the foregoing, we find no error or abuse of discretion by the trial court, and thus affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judge Jenkins did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/16/2017