2022 PA Super 113

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| :--- | :--- | :--- |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TROY ANTHONY ROBINSON | : | No. 1127 EDA 2021 |

Appeal from the PCRA Order Entered May 17, 2021,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s):  CP-51-CR-0005169-2012.

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

OPINION BY KUNSELMAN, J.:                    **FILED JUNE 27, 2022**

The Commonwealth appeals from the grant of appellee Troy Anthony Robinson's first petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541–9546.  The PCRA court awarded Robinson a new trial based on his trial counsel's ineffectiveness for failing to call an expert witness in the field of eyewitness identification.  We affirm.

## I.    Procedural and Factual History

Robinson was initially charged with attempted murder, aggravated assault, and related offenses based upon a report that he shot at Philadelphia Police Officer Timothy Fitzgibbon on Thanksgiving, November 24, 2011.  The charge of attempted murder was *nolle prossed* after police determined that the gun recovered at the scene had not been fired.  The case proceeded to a bifurcated waiver trial on the remaining counts in October of 2014.

---

[*] Former Justice specially assigned to the Superior Court.

At trial, Officer Fitzgibbon testified that the weather was sunny and clear on November 24, 2011. Around 12:30 p.m., he received a radio call reporting a robbery in progress on Greeby Street in Oxford Circle. The radio call reported four black males. Officer Fitzgibbon activated his patrol vehicle's lights and sirens and drove north on Cranford Street toward the area.

While Officer Fitzgibbon was driving north, he saw a man[1] walking south, away from the location of the reported robbery. The man was "wearing a blue jacket with dark jeans" and talking on a cell phone.[2] When Officer Fitzgibbon first saw him, the man was about ten feet away. There were two Hispanic males standing less than five feet from the man, talking to each other. There were no other pedestrians in the area. Officer Fitzgibbon turned right on Passmore Street and "bladed" his vehicle—turned it at an angle and waited to hear if the robbery report was founded. Officer Fitzgibbon observed the man for 20 to 30 seconds; the man had stopped walking and twice said, "it's going down" on his cell phone.

Officer Fitzgibbon told the man, "Come here. Let me talk to you for a second." According to Officer Fitzgibbon, the man walked toward him, pulled a black handgun from his pocket, and pointed it at him. When he did so, the man was about 19 feet from Officer Fitzgibbon. Officer Fitzgibbon, scared that

---

[1] At trial, Officer Fitzgibbon always referred to the man as "the defendant."

[2] At the preliminary hearing, Officer Fitzgibbon had said the man was wearing "a blue jacket, like a hooded jacket," with "a white shirt on underneath it, dark pants, and black boots." N.T., 10/23/14 (testimony), at 68.

the man was going to shoot at him, leaned to the right in his vehicle and drove forward about three to four car lengths. In his rearview mirror, Officer Fitzgibbon saw the man standing in the center of the street, still pointing the gun at him. Officer Fitzgibbon heard what he thought was a gunshot. He sped to the end of the block, describing the man on police radio and to the patrol wagon at the end of the block.

Sergeant James Hawe testified that he had reported to Passmore Street within 30 seconds of Officer Fitzgibbon's flash information. When Sergeant Hawe arrived, he saw Robinson pacing by a chain link fence talking on his cell phone. According to Sergeant Hawe, Robinson matched the description that Officer Fitzgibbon had provided—"Blue hoodie, blue jeans, black boots, and a plaid shirt, pretty much." (Trial counsel elicited on cross-examination that Sergeant Hawe had not told detectives that Officer Fitzgibbon mentioned a plaid shirt.) Sergeant Hawe did not see anyone else present; anyone leaving the area would have to pass by police officers. Sergeant Hawe approached Robinson, patted him down, and asked what was going on.

About a minute and a half after his encounter with the man, Officer Fitzgibbon looped back around to Passmore Street. He immediately identified Robinson as the man who had shot at him. Police arrested Robinson, who was wearing a jacket, black boots, black socks, a white t-shirt, a light blue plaid buttoned-down shirt, and blue jeans. Police searched the area and found a silver-and-black semiautomatic handgun under a car next to where Robinson

was standing. However, they did not find any bullets, shell casings, or strike marks, and there was no round in the chamber of the gun.

The jury and trial court convicted Robinson of the respective charges before them. After imposing sentence, on February 19, 2015, the court granted Robinson's motion for reconsideration and resentenced him to an aggregate term of nine years and nine months to nineteen years and six months of incarceration. We affirmed Robinson's judgment of sentence on direct appeal. *Commonwealth v. Robinson*, No. 807 EDA 2015, 2016 WL 6820530 (Pa. Super. Nov. 18, 2016) (unpublished memorandum).[3] Robinson did not petition the Pennsylvania Supreme Court for review.

Robinson filed a *pro se* PCRA petition on November 8, 2017 and an amended petition through counsel on July 8, 2020. The PCRA court held a virtual evidentiary hearing on April 19, 2021, where Robinson presented the testimony of his trial counsel and of Dr. Suzanne Mannes. The court qualified Dr. Mannes as an expert in eyewitness identification. On May 17, 2021, the court granted Robinson's PCRA petition and awarded him a new trial. The Commonwealth timely appealed. The PCRA court and the Commonwealth complied with Pennsylvania Rule of Appellate Procedure 1925.

The Commonwealth presents the following issue for our review:

> Did the PCRA court err by ordering a new trial, where [Robinson] failed to prove that trial counsel was ineffective for failing to call

_____

[3] Robinson's issues on direct appeal were whether his pointing a firearm was sufficient to show intent to place Officer Fitzgibbon in fear of serious bodily injury (it was) and whether his sentence was excessive (it was not).

an identification expert to testify regarding the alleged unreliability of the victim's identification and where (1) trial counsel's defense strategy was reasonable, (2) the presentation of an identification expert would have been unsuited to counsel's defense strategy, and (3) the failure to call such an expert did not prejudice [Robinson]?

Commonwealth's Brief at 4.

## II. Ineffective Assistance of Trial Counsel

Our scope and standard of review on appeal from the grant of PCRA relief are well-settled. Our scope of review "is limited to the PCRA court's findings and evidence of record," viewed here in the light most favorable to Robinson as the party who prevailed before the PCRA court. *Commonwealth v. Small*, 238 A.3d 1267, 1280 (Pa. 2020) (citing *Commonwealth v. Hanible*, 30 A.3d 426, 438 (Pa. 2011)). "[O]ur standard of review calls for us to determine whether the ruling of the PCRA court is supported by the record and free of legal error." *Commonwealth v. Wharton*, 263 A.3d 561, 567 (Pa. 2021) (quoting *Commonwealth v. Washington*, 927 A.2d 685, 583 (Pa. 2007)).

Here, the issue is whether Robinson's trial counsel was ineffective. For PCRA relief based on a claim that trial counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009); 42 Pa.C.S.A. § 9543(a)(2)(ii). "Generally, counsel's performance is presumed to be constitutionally

adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." *Id.* This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) the petitioner was prejudiced by counsel's act or omission. *Id.* at 533. A finding of "prejudice" requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

The PCRA court found that Robinson's trial counsel was ineffective based on *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014), which was decided about five months before trial. *Walker* reversed Pennsylvania's evidentiary prohibition of expert testimony about eyewitness identification and held that such testimony is admissible at the trial court's discretion. *Id.* at 793. In so holding, our Supreme Court considered scientific evidence about five factors affecting eyewitness identification:

> (1) the phenomenon of "weapons focus"; (2) the reduced reliability of identification in cross-racial identification cases; (3) the significantly decreased accuracy in eyewitness identifications in high-stress/traumatic criminal events; (4) increased risk of mistaken identification when police investigators do not warn a witness, prior to viewing a photo array or line up, that the perpetrator may or may not be in the display; and (5) the lack of a strong correlation between witness statements of confidence and witness accuracy.

*Id.* at 773 (citation omitted). The court concluded that expert testimony about identification does not invade the province of the jury as the

determiners of credibility; rather, it educates jurors and helps them understand counterintuitive factors. *Id.* at 784.

Notably, *Walker* reasoned that reliance on cross-examination and closing argument does not justify a *per se* bar against expert identification testimony:

> While cross-examination and advocacy in closing argument may be common methods to unearth falsehoods and challenge the veracity of a witness, it is less effective in educating the jury with respect to the fallibility of eyewitness identification. *See* [*Connecticut v.*] *Guilbert*, 49 A.3d [705,] 725 [(Conn. 2012)] ("cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs"). This is especially true when cross-examining a neutral, credible, and confident witness before a jury, which may overestimate the veracity and reliability of eyewitness identification. Indeed, such information would not be within the permissible scope of cross-examination. If permitting expert testimony on relevant factors impacting eyewitness identification does not go to credibility, but to educating the jury, and if such factors are possibly not known or understood, or even misunderstood, by jurors, then the more effective way of educating the jury is not through the eyewitness him or herself, but through the presentation of such testimony by an expert when appropriate.
>
> \* \* \*
>
> Thus, we reject reliance upon cross-examination and closing arguments as sufficient to convey to the jury the possible factors impacting eyewitness identification and as justification for an absolute bar of such expert testimony, and recognize the potential advantages of expert testimony as a means to assist the jury where mistaken identity is a possibility. *See* [*State v.*] *Clopten*, 223 P.3d [1103,] 1110 [(Utah 2009)] ("Even if cross-examination reveals flaws in the identification, expert testimony may still be needed to assist the jury").

*Walker*, 92 A.3d at 786 (citation omitted).

In short, the ***Walker*** court changed a longstanding rule and held that identification expert testimony would be admissible at the discretion of the trial judge when it is relevant; "generally speaking, it would be where the Commonwealth's case is solely or primarily dependent upon eyewitness testimony." ***Id.*** at 787.

The ***Walker*** court further noted that expert identification testimony must also satisfy the requirements of Pennsylvania Rule of Evidence 702 and ***Frye v. United States***, 293 F. 1013 (D.C. Cir. 1923). ***Id.*** at 788–90 (finding that testimony about the five listed factors (1) addresses matters beyond the average layperson's knowledge and (2) helps the trier of fact understand the evidence or determine a fact in issue; remanding for a hearing to determine (3) "if the methodology that underlies the evidence has general acceptance in the relevant scientific community"). Finally, a trial court could exclude such testimony "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." ***Id.*** at 791 (citing Pa.R.E. 403).

The court explained:

Of course, the question of the admission of expert testimony turns not only on the state of the science proffered and its relevance in a particular case, but on whether the testimony will assist the jury. Trial courts will exercise their traditional role in using their discretion to weigh the admissibility of such expert testimony on a case-by-case basis. It will be up to the trial court to determine when such expert testimony is appropriate. If the trial court finds that the testimony satisfies ***Frye***, the inquiry does not end. The admission must be properly tailored to whether the testimony will

focus on particular characteristics of the identification at issue and explain how those characteristics call into question the reliability of the identification. We find the defendant must make an on-the-record detailed proffer to the court, including an explanation of precisely how the expert's testimony is relevant to the eyewitness identifications under consideration and how it will assist the jury in its evaluation. The proof should establish the presence of factors (e.g., stress or differences in race, as between the eyewitness and the defendant) which may be shown to impair the accuracy of eyewitness identification in aspects which are (or to a degree which is) beyond the common understanding of laypersons.

*Id.* at 792.

Following **Walker**, we reviewed a post-trial ruling on admissibility of expert identification testimony in **Commonwealth v. Selenski**, 158 A.3d 102 (Pa. Super. 2017), *appeal denied*, 170 A.3d 1056 (Pa. 2017), *denial of post-conviction relief affirmed*, 228 A.3d 8 (Pa. Super. 2020). We held that while identification expert testimony is relevant "where the Commonwealth's case is solely or primarily dependent upon eyewitness testimony" it can also be relevant in other cases, leaving admissibility to the trial courts' discretion. **Id.** at 111–13 (interpreting **Walker**, 92 A.3d at 787); **see Commonwealth v. Brown**, 200 A.3d 986, 990–91 (Pa. Super. 2018) (affirming the denial of such testimony where the eyewitness identification was corroborated). However, we rejected a rule that such testimony is necessarily admissible when **non**-identification evidence alone is insufficient to prove guilt beyond a reasonable doubt. **Selenski**, 158 A.3d at 111, 116; **Cf. Commonwealth v. Thomas**, 215 A.3d 36, 48–50 (Pa. 2019) (finding "no need" for Dr. Mannes' testimony where non-identification evidence established guilt and identity).

In reviewing Robinson's claim that trial counsel was ineffective for failing to call an identification expert in light of **Walker**, we now turn to the three prongs of ineffectiveness: arguable merit, lack of a reasonable basis, and prejudice. **Johnson**, **supra**.

**A. Arguable Merit**

To prove arguable merit based on trial counsel's failure to call a witness, a PCRA petitioner must "show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice[.]" **Commonwealth v. Chmiel**, 30 A.3d 1111, 1143 (Pa. 2011) (quoting **Commonwealth v. Wayne**, 720 A.2d 456, 470 (Pa. 1998)). In this context, prejudice means that "the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." **Commonwealth v. Williams**, 141 A.3d 440, 460 (Pa. 2016) (quoting **Commonwealth v. Sneed**, 45 A.3d 1096, 1109 (Pa. 2012)). Thus, if the proposed testimony "would have been helpful to the defense," then there is arguable merit. **Id.**

The record supports the PCRA court's conclusion that Robinson's claim has arguable merit. Dr. Mannes existed and was available at the time of Robinson's trial. Additionally, she would have been willing and able to appear.

Further, Robinson's trial counsel had a duty to know that he could have presented an expert identification witness in this case. **Walker** was decided about five months prior to trial. "Trial counsel's performance is evaluated

under the standards in effect at the time of trial." *Commonwealth v. Baumhammers*, 92 A.3d 708, 729 (Pa. 2014) (citations omitted); *cf. Commonwealth v. Daniels*, 104 A.3d 267, 312–14 (Pa. 2014) (rejecting an argument that a defendant lacked notice about an instruction based on a case decided six months before trial); *Commonwealth v. Smith*, 17 A.3d 873, 894 (Pa. 2011) (considering ineffectiveness based on a case decided one week before the final supplemental post-trial motion); *Commonwealth v. Rivera*, 154 A.3d 370, 379 (Pa. Super. 2017) (*en banc*) (finding ineffectiveness for failing to advise about a case decided seven months before plea); *see also Commonwealth v. Lippert*, 85 A.3d 1095, 1101 (Pa. Super. 2014) (permitting an ineffectiveness claim for not advising about legislation that was enacted but not yet effective at the time of plea); *Holland v. Horn*, 150 F. Supp. 2d 706, 748 n.37 (E.D. Pa. 2001), *aff'd based on lack of prejudice*, 519 F.3d 107 (3d Cir. 2008) (noting that being unaware of a decision four months before trial would violate counsel's duty of adequate representation).

We thus conclude that counsel had a duty to know of the effect of a "watershed decision" five months before trial. *Selenski*, 158 A.3d at 107. Our high court held that expert identification testimony is relevant in cases that are "solely or primarily dependent upon eyewitness testimony." *Walker*, 92 A.3d at 787. Here, because the Commonwealth's case "solely or primarily" depended on eyewitness testimony, trial counsel should have known that relevant expert identification testimony would have been admissible under *Walker*.

- 11 -

Within the arguable merit analysis, the record supports the PCRA court's conclusion that the presentation of identification expert testimony could have helped the jury. In her PCRA hearing testimony and expert report, Dr. Mannes described a scientific model for how humans create memory, which is different than how a lay person might conceive that process. She surveyed the five factors listed in **Walker**, explaining how they might have affected Officer Fitzgibbon's identification of Robinson.[4]

_____

[4] With respect to weapon focus, Dr. Mannes explained:

> When presented with a weapon, the eyewitness' tendency is to focus on that immediate threat rather than to focus on the perpetrator. This switch in attention results in poorer ability to accurately recall details that would help distinguish one person from another. . . .

> In this case, Police Officer Fitzgibbon is clearly threatened by the gun and switches his focus from the perpetrator's face enabling him to describe the gun as being pulled from the perpetrator's left pocket. He is later able to recognize it suggesting that a fair amount of his attention was focused on it.

Amended Petition, 7/8/20, Exh. A (Mannes Report), at 12 (unnumbered) (citation and italics omitted). She explained at the PCRA hearing how police weapons training can reduce weapon focus, but even absent weapon focus, Officer Fitzgibbon could still have misidentified Robinson.

Regarding "cross-racial identification," Dr. Mannes explained that accuracy "also has to do with what we call in-group and out-group identifications[;] we label people differently if we feel like they're in our group." Here, "Officer Fitzgibbon and the perpetrator are of different races." *Id.* at 13. (There is no other record evidence of Officer Fitzgibbon's race; however, the Commonwealth does not dispute this aspect.)

With respect to stress and fear, Dr. Mannes explained how "very high levels of stress and arousal are associated with poorer identification accuracy,"
*(Footnote Continued Next Page)*

Beyond the five **Walker** factors, Dr. Mannes also described other variables that can affect identification. Additional "estimator variables" include the length of time Officer Fitzgerald had to view the perpetrator, the physical distance between them, the lighting, and the delay between the incident and identification. Mannes Report, at 11–14 (noting a study that even "identification performance on an immediate test was only about 75%"). Dr. Mannes also described "unconscious transference," where a witness identifies a person based only on having seen that person in another context; however, Officer Fitzgibbon had not been acquainted with Robinson before Thanksgiving of 2011. **Id.** at 17. Dr. Mannes concluded, to a reasonable degree of certainty based on her field of expertise, that the circumstances of this case "raise[] questions regarding the validity of the identification." **Id.** at 18.

This testimony could have provided the jury an additional framework to assess whether Officer Fitzgibbon's identification was accurate. Therefore, the

---

reasoning that Officer Fitzgibbon was "clearly frightened" because he drove away for his safety. **Id.**

Dr. Mannes described issues that can arise in an in-person lineup procedure as "system variables." **Id.** at 14. She indicated several problematic aspects of Officer Fitzgibbon's identification of Robinson, including that there was no line-up or instruction to Officer Fitzgibbon, there was only an "extremely vague" description that did not mention the man's face, there was no "evidence-based suspicion" that Robinson was the perpetrator, and Sergeant Hawe knew that Robinson was his suspect. **Id.** at 14–17.

Regarding confidence, Dr. Mannes explained that there is "little to no relationship" between confidence and accuracy, but only "38% of jurors believe that confidence is not a good predictor of accuracy." **Id.** at 17 (citation omitted). She observed that although Officer Fitzgibbon was confident in his identification, he had been mistaken that the perpetrator had shot at him. **Id.**

relevant testimony by Dr. Mannes "would have been beneficial under the circumstances of the case." *Williams*, 141 A.3d at 460; *see Walker*, 92 A.3d at 791 (concluding that "expert testimony regarding eyewitness identification in these circumstances could be probative and beneficial to the jury"). Because trial counsel had a duty to know that he could present an eyewitness identification expert, and because Dr. Mannes was available and willing to provide testimony that was helpful to the defense, the record supports the PCRA court's conclusion that Robinson's claim of ineffective assistance of counsel has arguable merit.

## B. Reasonable Basis

To show that trial counsel had no reasonable basis for his or her chosen trial strategy, a PCRA petitioner must prove that his alternative strategy "offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Brown*, 196 A.3d 130, 150 (Pa. 2018) (quoting *Commonwealth v. Spotz*, 18 A.3d 244, 260 (Pa. 2011).

> When assessing whether counsel had a reasonable basis for his act or omission, the question is not whether there were other courses of action that counsel could have taken, but whether counsel's decision had any basis reasonably designed to effectuate his client's interest. . . . [T]his cannot be a hindsight evaluation of counsel's performance, but requires an examination of whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect the defendant's interests. Our evaluation of counsel's performance is highly deferential.
>
>> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than

- 14 -

> complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> **Strickland** [**v. Washington**], 466 U.S. [668,] 690–91 [(1984)].

**Williams**, 141 A.3d at 463 (quotations, brackets, and citations omitted). Counsel is expected to know and follow applicable law. **Commonwealth v. Pou**, 201 A.3d 735, 741–42 (Pa. Super. 2018) (finding no reasonable strategy where failure to raise an issue was due to ignorance of the law); **Commonwealth v. McClellan**, 887 A.2d 291, 300–01 (Pa. Super. 2005) (finding counsel's strategy to be unreasonable based on counsel's unawareness of procedural rules). However, "the failure to call an expert witness does not necessarily render counsel's performance deficient," as when counsel "is able effectively to cross-examine prosecution witnesses and elicit helpful testimony." **Williams**, 141 A.3d at 464 (quoting **Chmiel**, 30 A.3d at 1143).

Here, the record supports the PCRA court's conclusion that trial counsel had no reasonable basis for failing to present expert identification testimony. At the PCRA hearing, trial counsel testified that his trial strategy was to argue that Robinson was present at the scene but did not have a gun, and that Officer Fitzgibbon mistook Robinson's cell phone for a gun. N.T., 4/19/21, at 29. He denied even considering a challenge to Officer Fitzgibbon's

identification of Robinson. *Id.* at 17, 27–28, 34 (explaining why he did not feel it was a viable defense). Significantly, trial counsel was unsure if he read *Walker* before or after trial. *Id.* at 18 ("I can't recall when I read it, but I think we had some training on it or some experience with it at some point, but before or after, I'm not certain."). Regardless, he testified that considering the facts, he did not think that the defense needed expert testimony on identification. *Id.* at 19.

The Commonwealth argues that trial counsel's asserted strategy of arguing that Officer Fitzgibbon mistook Robinson's cell phone for a gun was reasonable. Commonwealth's Brief at 16. It claims that a misidentification defense would have been inconsistent with this strategy. *Id.* at 17–20.

However, review of the record shows that trial counsel **did** present a misidentification defense, both in cross-examining the police witnesses and in arguing to the jury. Trial counsel questioned the witnesses about Officer Fitzgibbon's description of the alleged shooter and how his client differed from that description. He pointed out discrepancies like Robinson's plaid shirt, beard, and prayer mark. N.T., 10/23/14 (testimony), at 65–70, 103–10. He emphasized two other ways that Officer Fitzgibbon was mistaken—whether the gun was fired and what color it was. He argued that these mistakes showed that Officer Fitzgibbon was also mistaken about Robinson being the man he saw. Trial counsel further argued in closing that Robinson was not the only person on the street. N.T., 10/24/14 (closing arguments), at 13–16

("We know there's people on the street. Are you actually going to buy this, that you didn't see anybody?"). He continued:

> And then we're going to be asked to believe that after -- after pointing a gun at a police officer, running up to him, pointing a gun at a police officer, my client is just going to be talking on a cell phone around the corner. Excuse me? Does that sound reasonable to you? Maybe he was the only black guy in a windbreaker and talking on a cell phone that Sergeant Hawe saw.
>
> And maybe, a minute and a half later, after Officer Fitzgibbon's -- I think, ran for his life and really thought that somebody was going to shoot him -- he comes around and who does the sergeant have? This is the only guy his sergeant have, is a guy in a windbreaker -- blue windbreaker and blue jeans. That's the guy.
>
> Because that's what it comes down to. You have to determine whether or not, given the mistakes that were made, clear, innocent mistake, that one that was caused by stress, that was caused by a misperception, the one that we know that wasn't true, **given that mistake that was made by Officer Fitzgibbon, can you rely on his identification?**
>
> Given the fact that there was never any description given by Officer Fitzgibbon about a beard, about this mark right here on the forehead -- didn't you hear [the prosecutor] during his direct examination, where he kept asking him, was there something unusual about the guy that you saw? Did you notice anything unusual that made you identify him?
>
> Did you hear Fitzgibbon say, yeah, when I was looking at him, when he was real close, when he was running up to me, when I was looking at his face, I saw that beard. And I saw he had this mark right in the middle of his forehead. You can see it from where you are, on a bright sunny day. He never mentioned that.
>
> **Did Officer Fitzgibbon really see the face of the person that was standing there doing whatever he was doing?** Did that person really have a gun? Did that person really fire a gun? That's what you have to decide beyond a reasonable doubt, ladies and gentlemen.
>
> \* \* \*

What you have to decide is whether beyond any reasonable doubt, you can conclude, and under all the circumstances, my client, who didn't match the description except that he was a black male, who wasn't running or acting out of breath, who didn't visibly have anything that might be a weapon, would have pointed something at Officer Fitzgibbon, **whether he was even that guy that was on that street.**

*Id.* at 17–20 (emphasis added). Conversely, counsel for the Commonwealth argued that Officer Fitzgibbon's identification was correct. *Id.* at 41–46.

Because trial counsel did present a misidentification defense, the question before the PCRA court was whether Robinson demonstrated that it was unreasonable for his counsel not to call an identification expert in support of this defense. That is, the PCRA court had to determine whether this alternative strategy of calling such an expert "offered a potential for success substantially greater than the course actually pursued." ***Brown***, ***supra***.

The PCRA court found that Robinson's trial counsel had no reasonable basis for failing to present expert testimony about eyewitness identification in light of ***Walker*** and the facts of this case. "[The Commonwealth's] arguments that the trial counsel's strategy was reasonable and that the presentation of an identification expert would have been unsuited to counsel's defense strategy fall[] flat when considering the ***Walker*** Court's decision and the crucial effects of eyewitness identification." PCRA Court Opinion, 7/22/21, at 7.

The law and the record support the PCRA court's conclusion. Our Supreme Court recognized that cross-examination and argument alone may be insufficient to convey the factors affecting eyewitness identification to the

jury. *Walker*, 92 A.3d at 786 (citation omitted). Rather, there is a potential advantage of expert testimony to assist the jury. *Id.* The Commonwealth has not suggested any reason for trial counsel, in arguing misidentification in this case, to omit expert identification testimony.[5] Likewise, Robinson reiterates, "there is no reasonable explanation for [trial counsel's] failure to call an expert; and no such explanation was ever given at the PCRA evidentiary hearing because trial counsel outright denied that misidentification was ever part of his strategy." Robinson's Brief at 15. We will not attempt to rationalize trial counsel's failure to present expert identification testimony consistent with his defense, where neither the Commonwealth nor trial counsel provided any explanation. Based on our standard of review, we find sufficient grounds to support the PCRA court's conclusion that trial counsel had no reasonable basis to omit expert evidence in this case.

In summary, trial counsel did not know if he read *Walker* before trial, yet he maintained that he did not think this evidence was needed for his defense, which conceded Robinson's presence. Contrary to trial counsel's recollection, the record reflects that he raised a misidentification defense at trial, both in questioning witnesses and in arguing to the jury. Robinson showed that presenting expert identification testimony would have assisted the jury in weighing this defense. The Commonwealth has not suggested any

---

[5] The Commonwealth's arguments that an identification expert would have been **inconsistent** with the defense strategy lack merit. As illustrated above, expert identification testimony would have been **consistent** with the tactics that trial counsel actually employed.

reason to omit this evidence based on the misidentification defense raised at trial. Therefore, the record supports the PCRA court's conclusion that trial counsel had no reasonable basis not to present expert identification testimony, and we discern no reason to overturn it.[6]

## C. Prejudice

Finally, the record supports the PCRA court's conclusion that Robinson demonstrated prejudice, meaning "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Johnson**, 966 A.2d at, 533.

The Commonwealth argues that the lack of Dr. Mannes' testimony at trial did not prejudice Robinson. Commonwealth's Brief at 20–25. The Commonwealth tries to distinguish the facts from those in **Walker**: Officer Fitzgibbon had time to observe the man on the street in a stress-free situation with good visibility, he described the man he saw, and he returned to identify Robinson in a short time. Further, it emphasizes how Sergeant Hawe did not see anyone else in the area, and anyone leaving would have passed by police

---

[6] Our high court did not decide if counsel must always present expert identification testimony. **Walker**, 92 A.3d at 787. **But see id.** at 805 (Eakin, J., dissenting) ("While such issues are recognized by the majority, they are not discussed, yet in every case of identification it will of course be ineffectiveness for defense counsel to fail to call such a witness now—what reasonable strategy is advanced by failing to do so?"). Neither do we hold that **Walker** requires trial counsel to present expert identification testimony every time identification is at issue. A rule of *per se* ineffectiveness appears inconsistent with the range of strategies available to the defense. However, where no reason is given to omit this evidence, then the record supports the conclusion that there is no reasonable basis to do so.

officers. The Commonwealth characterizes Dr. Mannes' report as general, speculative information, which would have been of limited use applied to the facts. Therefore, it submits that the PCRA court erred in finding prejudice.

We first reject the Commonwealth's characterization of the utility of the proposed expert testimony. In accordance with **Walker**, Dr. Mannes described numerous scientific aspects of eyewitness identification that are beyond the knowledge of most jurors. **See Walker**, 92 A.3d at 788–89. For each factor, she described its application to Robinson's case in a way that would have helped the jury. **See id.** at 789. Dr. Mannes admitted that police weapons training can reduce the "weapon focus" effect, explaining that one's status as a police officer would not mitigate the other factors' adverse effects on identification. She cited numerous studies in her field. She concluded that that the factors "raise[] questions regarding the validity of the identification" at issue. Mannes Report, at 18. This supports the PCRA court's conclusion that Dr. Mannes would have testified favorably to Robinson.

Moreover, the questions from the jury demonstrate that identity was a key issue in this case. The questions uniquely illuminate how expert testimony would have helped the jury evaluate the accuracy of Officer Fitzgibbon's identification. The jury submitted several questions consistent with inquiring into whether Robinson was the man whom Officer Fitzgibbon saw.[7] **E.g.**, N.T.,

_____

[7] We recognize the limited utility of analyzing questions from the jury during its deliberative process. Here, we consider these questions only to illustrate
*(Footnote Continued Next Page)*

10/24/14 (trial), at 38–39 ("Who is the weapon registered to? Is the defendant left or right-handed? Was the prayer mark present at the time of the defendant's arrest? Can we hear the original police, quote, officer arrest, unquote, flash?"); N.T., 10/27/14, at 10 ("Can we be told again what reasonable doubt is?"), 11 ("[C]an we see the first reports that were made by Officer Fitzgibbon and Sergeant Hawe, the reports that were mentioned in the trial[?]"), 21 ("What is the first description of the suspect in Officer Fitzgibbon and also Sergeant Hawe's first report following the incident?").[8]

Here, Dr. Mannes would have testified to the **Walker** factors in a way that would have helped the jury determine whether Officer Fitzgibbon's identification was accurate, in a case that depended on identity. Specifically, she would have informed the jurors of factors implicated in this case, commonly misunderstood by lay persons, that would cast the accuracy of the identification into doubt. If the jury was not satisfied beyond a reasonable doubt that Robinson was the perpetrator, then it would not have found him

---

the relevance of identification at trial. **See Commonwealth v. Smith**, 675 A.2d 1221, 1233–34 & n.13 (Pa. 1996) (plurality) (noting a jury question to find that counsel was ineffective in not presenting evidence on that subject); **see also Commonwealth v. Tilley**, 595 A.2d 575, 581 (Pa. 1991) (considering a jury question to determine if the trial court should have granted a mistrial); **Commonwealth v. Jasper**, 587 A.2d 705, 711–12 (Pa. 1991) (finding prejudice to a defendant based on the answer to a jury question).

[8] The jury also submitted a question that was **inconsistent** with an inquiry into mistaken identity. N.T., 10/27/14, at 11–12 ("[C]an we have a definition of aggravated assault[?]").

guilty. We thus find that the record supports the PCRA court's conclusion that Robinson was prejudiced by counsel's ineffectiveness.[9]

### III. Conclusion

The PCRA court's conclusion that Robinson's trial counsel was ineffective is supported by the record and free of legal error. First, the record supports that Robinson's claim has arguable merit. The Commonwealth's case against Robinson depended "solely or primarily" on identification. Trial counsel argued that Officer Fitzgibbon's identification was wrong. Thus, under **Walker**, he could have presented an expert witness to help the jury assess factors that could cast the accuracy of that identification into doubt. Trial counsel should have known that **Walker**, decided five months before trial, applied. An expert witness existed and was available to testify to help the defense. Therefore, we agree with the PCRA court that there is arguable merit to Robinson's claim that trial counsel was ineffective for failing to present this evidence.

Likewise, the record supports the PCRA court's finding that there was no reasonable basis for trial counsel to raise a misidentification defense without

---

[9] The dissent disputes the PCRA court's finding of prejudice, reasoning that other evidence corroborated Officer Fitzgibbon's unequivocal identification such that there is no reasonable probability that Dr. Mannes' testimony would have changed the verdict. Sergeant Hawe's response, the gun's proximity to Robinson, and other officers' presence around the area support Robinson's identity as the perpetrator. But despite hearing this evidence, the jury submitted numerous identity-related questions over a long deliberation. As clear as the evidence appeared, it could appear less clear to a jury properly informed of the **Walker** factors. Respectfully, the record supports the PCRA court's finding as to the prejudice element of ineffective assistance of counsel.

presenting expert witness testimony about eyewitness identification. The case facts implicated all five *Walker* factors. Trial counsel, who was not even sure if he had read *Walker* before trial, did not provide any basis for not presenting an identification expert. Nor does the Commonwealth suggest any reasonable basis to explain why trial counsel's failure to present expert testimony **consistent** with a raised defense was nonetheless reasonable. Accordingly, the PCRA court did not commit error in finding that Robinson demonstrated that trial counsel had no reasonable basis not to present this evidence.

Finally, the record supports the PCRA court's finding that trial counsel's error prejudiced Robinson. Trial counsel raised a misidentification defense at trial. The jury's questions illuminate the substantial questions surrounding identification of the perpetrator. If the jury had the benefit of this additional evidence about matters commonly misunderstood by lay people, there is a reasonable probability that the result of trial would have been different. Based on our review, we find no error in the PCRA court's conclusion that trial counsel was ineffective for failing to present expert testimony about eyewitness identification.

We emphasize the limited nature of our holding. *Walker* permitted expert testimony in the field of eyewitness identification but did not require it. As such, we do not hold that trial counsel will always be ineffective for failing to present such an expert when raising a misidentification defense. Indeed, it is easy to conceive compelling reasons why counsel, after investigating the relevant facts and law, might elect not to present such evidence.

Here, however, trial counsel denied that he raised a misidentification defense at trial—an assertion that the record contradicts. As such, he did not provide any strategic reason for failing to provide expert testimony to help the jury consistent with his chosen defense in light of *Walker*. Nor does the Commonwealth provide any reasons that could support such a choice. Furthermore, there is scant support to find that trial counsel had even read *Walker* in the five months leading up to trial. As such, the Commonwealth has not demonstrated how the PCRA court erred in finding that Robinson met his burden to prove that his trial counsel was ineffective.

Order affirmed.

Judge Lazarus joins the Opinion.

President Judge Emeritus Stevens files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2022